**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00536-WJM-SP

CRYSTAL GARDENS SANCTUARY, INC.

      Plaintiff,

v.

CENTURYLINK COMMUNICATIONS, LLC
d/b/a LUMEN TECHNOLOGIES GROUP,

      Defendant.

---

**CENTURYLINK COMMUNICATIONS, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PROCEDURAL HISTORY ......................................................................................... 2

MOVANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS ............................... 3

ARGUMENT ............................................................................................................. 12

   I.    Crystal Gardens' Breach of Contract Claim Fails. ......................................... 13

      A.   The Local Access Service Exhibit Governs this Dispute. ............................... 13

      B.   Crystal Gardens' Order Was Cancelled When It Refused To Pay
          Additional Necessary Construction Expenses. ................................................. 15

      C.   Crystal Gardens' Attempts to Dispute the Cancellation Fail. ......................... 18

   II.   Crystal Gardens Has Already Received All Relief to Which It Could
        Be Entitled. ..................................................................................................... 21

      A.   Specific Performance Is Not an Appropriate Remedy Here. .......................... 22

      B.   The Contract Bars Further Monetary Relief. .................................................. 24

CONCLUSION ......................................................................................................... 27

Cases

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92 (2d Cir. 2002) ............... 14

*Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373 (Colo. 2000) ................................................................................................. 15

*Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473 (S.D.N.Y. 2011) ........................ 22

*Cho v. 401–403 57th St. Realty Corp.*, 752 N.Y.S.2d 55 (N.Y. App. Div. 2002) ............ 22

*Cohen v. CASSM Realty Corp.*, 39 N.Y.S.3d 597 (N.Y. Sup. Ct. 2016) ........................ 22

*Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513 (10th Cir. 1994) ............................................................................................................ 13

*French v. Centura Health Corp.*, 509 P.3d 443 (Colo. 2022) ........................................ 15

*Hadcock Motors v. Metzger*, 459 N.Y.S.2d 634 (1983) ................................................ 21

*Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487 (N.Y. 1989) ............. 26, 27

*Hylan Ross, LLC v. 2582 Hylan Boulevard Fitness Grp., LLC*, 172 N.Y.S.3d 29 (N.Y. App. Div. 2022) ................................................................................... 15

*In re September 11 Litig.*, 640 F. Supp. 2d 323 (S.D.N.Y. 2009) .................................. 20

*Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430 (1994) ................................ 24

*MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43 (N.Y. 2009) ....................... 15

*Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509 (S.D.N.Y. 2018) ............. 14

*New London Assoc., LLC v. Kinetic Social LLC*, 384 F. Supp. 3d 392 (S.D.N.Y. 2019) ............................................................................................................ 14

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004) ................................................................... 13

*Oklahoma Fixture Co. v. ASK Comput. Sys.*, 45 F.3d 380 (10th Cir. 1995) ................. 26

*Pecorella v. Greater Buffalo Press, Inc.*, 486 N.Y.S.2d 562 (N.Y. App. Div. 1985) ........................................................................................................... 21

*Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F. Supp. 3d 259 (E.D.N.Y. 2014) .................................................................................................... 24, 25

*Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752 (S.D.N.Y. 2012) ................ 15

*Weight Loss Healthcare Centers of Am., Inc. v. Off. of Pers. Mgmt.*, 655 F.3d 1202 (10th Cir. 2011) ............................................................................................. 21

<u>Rules</u>

Fed. R. Civ. P. 56 ........................................................................................................ 12

Pursuant to Fed. R. Civ. P. 56, Defendant CenturyLink Communications, LLC d/b/a Lumen Technologies Group ("CenturyLink") moves for summary judgment against Plaintiff Crystal Gardens Sanctuary, Inc.'s ("Crystal Gardens") sole claim in this case.

## **INTRODUCTION**

This contract dispute is a textbook case for summary judgment. Crystal Gardens asserts one claim for breach of contract against CenturyLink, and seeks specific performance or damages. But the unambiguous text of the contract and the undisputed facts show that the contract was cancelled, and that Crystal Gardens is not entitled to any relief beyond the full refund it was already provided. Summary judgment is warranted.

In December 2020, Crystal Gardens' sole proprietor, Steve Ferguson, placed an Order for fiber-based internet services with CenturyLink, at a price of $66,000 over 24 months. The day before Mr. Ferguson signed the Order, CenturyLink informed him additional unanticipated construction charges were possible, and in that circumstance, Crystal Gardens could choose to pay the additional charges and proceed with the installation, or cancel the contract and receive a full refund of any amounts paid. Specific contractual terms incorporated by reference into the Order—which Mr. Ferguson admits to receiving and viewing prior to executing the Order on behalf of Crystal Gardens— clearly and unambiguously state this condition, and also state that the contract is subject to the availability of adequate capacity within CenturyLink's network.

Before service had been installed or started, CenturyLink determined that Crystal Gardens' service area in Estes Park, Colorado was at capacity. CenturyLink further determined that to provide the requested services, it would need to construct

supplemental "backbone" fiberoptic infrastructure to augment the fiberoptic capacity of the entire service area. This "backbone" construction job would require boring through earth and installing 19,500 feet of new fiberoptic cable, at an estimated cost of approximately $1,043,700. When CenturyLink informed Crystal Gardens of these additional necessary construction expenses, Crystal Gardens refused to pay them—but also refused to acknowledge the Order was cancelled as a result. After attempting to avoid a refund of its initial payment ($29,890) and obtaining fiber internet service from another provider at a lower cost, Crystal Gardens then sued CenturyLink.

The Court should enter summary judgment against Crystal Gardens' breach of contract claim for two independent reasons. *First*, the contract was cancelled. The contract expressly states that, under these circumstances, Crystal Gardens could either pay the additional construction charges or cancel the contract. Because Crystal Gardens refused to pay the additional charges, the Order was cancelled. *Second*, Crystal Gardens' remedies are limited by contract and common law, and it has already received the only remedy to which it could be entitled (and which CenturyLink tried to provide before this lawsuit)—a refund of all amounts paid, plus interest.

## PROCEDURAL HISTORY

On December 3, 2021, Crystal Gardens' sole proprietor, Steve Ferguson, sued "Lumen Technology, Inc." in the district court for Larimer County, Colorado, claiming breach of contract. In February 2022, Mr. Ferguson twice amended his pleading in state court and replaced CenturyLink as the defendant. On March 4, 2022, CenturyLink filed a Notice of Removal on the basis of diversity. Def.'s Notice of Removal [ECF No. 1]. On

June 28, 2022, Crystal Gardens filed a Third Amended Complaint substituting itself in place of Mr. Ferguson as Plaintiff. Third Am. Compl. [ECF No. 25].

The Third Amended Complaint asserts a single count for breach of contract. Third Am. Compl. ¶¶ 14–19. Specifically, Crystal Gardens alleges that CenturyLink breached the parties' contract to provide internet services by requesting that it pay an additional $1,043,700 in construction costs necessary to provide those services. *Id.* ¶ 12. Crystal Gardens seeks, among other relief, "[s]pecific [p]erformance by the Defendant under the contract" and "damages … in an amount to be proven at trial." *Id.* ¶ 19; *id.* at 3.

## **MOVANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS**

1. Crystal Gardens is a Colorado corporation located at 4905 U.S. Highway 36, Estes Park, CO 80517. Quereau Decl., Ex. A, Fed. R. Civ. P. 30(b)(6) Dep. of Crystal Gardens ("Crystal Gardens Dep.") at 19:24–20:6; Third Am. Compl., ¶ 1 [ECF No. 25].

2. Crystal Gardens' intended business is to host a six-acre garden of crystals and spiritual healing center at its property. Quereau Decl., Ex. A, Crystal Gardens Dep. at 17:16–23, 18:16-24, Ex. B, Pl.'s Resps. to 1st Set of Interrogs. at 3 (Interrog. 7).

3. Crystal Gardens' garden and healing center has never opened, is not currently open, and has no definite plans to open. Quereau Decl., Ex. A, Crystal Gardens Dep. at 25:5–15, 124:3–5.

4. Crystal Gardens' planned garden and healing center has suffered from delays due to significant permitting issues that have nothing to do with internet service. *Id.* at 23:19–25:15.

5. Crystal Gardens hosts two websites: crystalgardens.com and pathtohealing.com. *Id.* at 46:7-17.

6. Crystalgardens.com is "more or less, a landing page" and will remain so until the garden opens. *Id.* at 33:4–5.

7. Thepathtohealing.com receives approximately 5 to 10 authentic (non-bot) visits per day. *Id.* at 51:10–18, 52:17-20.

8. Steve Ferguson is the Chief Executive/President of Crystal Gardens. Quereau Decl., Ex. C, Pl.'s 2nd Suppl. Resps. to 1st Set of Interrogs. at 2 (Interrog. 6).

9. Crystal Gardens has no employees. The only person who does work on its behalf is Mr. Ferguson, who spends approximately 4-5 hours per week on its affairs. Quereau Decl., Ex. A, Crystal Gardens Dep. at 32:16–23.

10. Crystal Gardens' online activities do not include any online transactions, streaming, or social media presence. *Id.* at 54:8–56:6.

11. CenturyLink is a telecommunications company that offers, among other things, fiberoptic internet services in Colorado. Friedman Decl. ¶ 5. At times since September 2020, CenturyLink has done business as Lumen Technologies Group. *Id.*

12. In late 2020, Mr. Ferguson, on behalf of Crystal Gardens, began discussions with Seth Friedman, a CenturyLink Account Manager, regarding a quote for service for Lumen's fiber-based internet. Friedman Decl. ¶ 9 & Ex. A.

13. During their discussions, Mr. Friedman presented Mr. Ferguson with two service term options at different prices: (1) a 24-month term with $28,320 in non-recurring charges plus $1,570 in monthly recurring charges, and (2) a 36-month term with $13,500

in non-recurring charges plus $1,435 in monthly recurring charges. Friedman Decl. ¶ 10 & Ex. B at PLAINTIFF 00002.

14.     On December 9, 2020, Mr. Friedman emailed Mr. Ferguson a Quote for Service for the two-year term. Friedman Decl. ¶ 10 & Ex. A at CTL_000001.

15.     Mr. Friedman's December 9, 2020 email included the following "question-and-answer" explanation of possible additional costs if construction were required to provision the requested service, and the customer's option to cancel:

> Q: Is there going to be a high cost that will increase the monthly spend once your site survey engineer arrives and confirms a need for a higher spend?
>
> A: Very unlikely but possible. ***If so, you can cancel the service request at $0 cost or move forward with the difference between what is quoted and what the high cost would be***.

Friedman Decl. ¶ 11 & Ex. A at CTL_000001 (emphasis added).

16.     Mr. Ferguson was aware that in the event additional construction expenses would be required, Crystal Gardens could cancel or pay the additional expenses and proceed with installation. Quereau Decl., Ex. D, Pl.'s Suppl. Resps. to 1st Set of Reqs. for Admis. at 3 (RFA 5), Ex. A, Crystal Gardens Dep. at 73:7–74:2.

17.     On December 10, 2020, Mr. Ferguson, on behalf of Crystal Gardens, signed and submitted an Order requesting fiberoptic internet services from CenturyLink. Friedman Decl., Ex. B, Order & Attachs. at CTL_00002–00004, Ex. C, Confirmation Email.

18.     Mr. Ferguson listed "Crystal Gardens Sanctuary LLC" as the customer on the Order. *See* Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00002. However,

at all times, the parties intended Crystal Gardens Sanctuary Inc. (the Plaintiff in this action) to be the customer. *See* Friedman Decl. ¶ 15.

19.     Through the Order, Mr. Ferguson requested that CenturyLink provide Crystal Gardens with fiberoptic internet services, including access to CenturyLink's fiberoptic network and connection speeds of 500 megabits per second (Mbps). Friedman Decl., Ex. B, Order & Attachs. at CTL_00002–00004. The two CenturyLink products in the Order are "IQ Data Bundle" (referring to internet port and other necessary equipment, i.e., network connection) and "Local Access" (referring to the physical fiber, i.e., physical network access and internet service). Friedman Decl. ¶ 16.

20.     The requested term of service listed in the Order is 24 months. *Id.*

21.     The costs listed in the Order include $1,570 in "monthly recurring charges" and $28,320 in one-time, "non-recurring charges." Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00002.

22.     These amounts were calculated by CenturyLink based on Mr. Ferguson's selection of the two-year contract. Quereau Decl., Ex. A, Crystal Gardens Dep. at 71:17–72:13.

23.     The service address listed in the Order is the location of Crystal Gardens, 4905 US Highway 36, Estes Park, CO 80517 ("Service Address"). Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00002; *see also* Brooks Decl. ¶ 12.

24.     The Service Address is located in CenturyLink's Estes Park service area. Brooks Decl. ¶ 12.

25.     The Order states:

"Terms and Conditions for CenturyLink IQ Data Bundle Offer" Lumen provides CenturyLink IQ Data Bundle services under: (a) the Data Bundle Offer Attachment ("Attachment") and (b) the CenturyLink IQ Networking, **Local Access** and Rental CPE **Service Exhibits**. CenturyLink IQ Data Bundle is a bundle composed of the following services: (a) CenturyLink IQ Networking (b) Local Access and (c) Rental CPE.

Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00002 (emphasis added).

26.     Mr. Ferguson reviewed this language before signing the Order. Quereau Decl., Ex. A, Crystal Gardens Dep. at 85:2–5.

27.     The Order also states:

***The services identified in this Order is subject to the Lumen or CenturyLink Master Service Agreement(s) and applicable Service Exhibit(s)/Service*** Schedule(s) between CenturyLink Communications, LLC d/b/a Lumen Technologies Group and Customer (or its affiliate if expressly provided for under such affiliate Maser Service Agreement). If Customer has not executed a service agreement for applicable services with an affiliate of Lumen ("Affiliate Agreement"), then the terms of the most recent Affiliate Agreement will apply to the Service (to the extent not inconsistent with this Order); In such cases, the current standard Service Exhibit(s)/Service Schedule(S) applicable to the Services will apply. If Lumen and Customer have not executed a Lumen or CenturyLink Master Service Agreement and/or applicable Service Exhibit(s)/Service Schedule(s) governing the Service and have not executed an Affiliate Agreement, Lumen's current standard Master Service Agreement and Service Exhibit(s)/Service Schedule(s) as of the date of this Order will govern, copies of which are available upon request. The Lumen entity providing Services is identified on the invoice.

Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00003 (emphasis added); Quereau Decl., Ex. D, Pl.'s Suppl. Resps. To 1st Set of Reqs. For Admis. at 1–2 (RFA 1).

28.     Mr. Ferguson also reviewed this language before signing the Order. Quereau Decl., Ex. A, Crystal Gardens Dep. at 85:6–19.

29.     Mr. Ferguson and Crystal Gardens received copies of the Lumen Master Service Agreement ("MSA"), CenturyLink Local Access Service Exhibit, and CenturyLink

IQ Networking Retail Service Level Exhibit prior to signing the Order. *Id.* at 85:20–88:25;

*see also* Friedman Decl., Ex B, Order & Attachs. at PLAINTIFF 00001–00015. He also

reviewed these documents. Quereau Decl., Ex. A, Crystal Gardens Dep. at 85:20–88:25.

30.     The Local Access Service Exhibit states:

4.1 <u>Ancillary Charges</u>. Ancillary charges applicable to Service include but are not limited to those ancillary services set forth in this section. If an ancillary charge applies in connection with provisioning a particular Service, CenturyLink will notify Customer of the ancillary charge to be billed to Customer. ***Customer may either approve or disapprove CenturyLink providing the ancillary service***.

…

(b) <u>Construction Charges.</u> Construction charges apply if: (i) special construction is required to extend Service to the demarcation point; or (ii) other activities not covered under the Building Extension Service Schedule are required beyond the demarcation point, that cause CenturyLink to incur additional expenses for provisioning the Service ('Construction'). ***If Customer does not approve of the Construction charges after CenturyLink notifies Customer of the charges, the Service ordered will be deemed cancelled***.

Friedman Decl., Ex B, Order & Attachs. at PLAINTIFF 0000013 (Local Access Service

Exhibit § 4.1) (emphasis added).

31.     The Local Access Service Exhibit also states: "***Provision of Services is***

***subject to availability of adequate capacity*** and CenturyLink's acceptance of an

Order." *Id.* (Local Access Service Exhibit § 3) (emphasis added).

32.     On December 11, 2020, Mr. Friedman requested that Crystal Gardens

complete a Credit Application Form relating to the Order, which Mr. Ferguson completed

and returned that same day. Friedman Decl. ¶ 23 & Ex. D.

33.     On December 17, 2020, Mr. Ferguson made an initial payment of $29,890 by wire transfer to CenturyLink for the requested services. Freidman Decl. ¶ 24 & Ex. E.

34.     The initial payment consisted of one month of the monthly recurring charges and the non-recurring charges listed in the Order. Freidman Decl. ¶ 25 & Ex. E; Quereau Decl., Ex. A, Crystal Gardens Dep. at 95:10–96:20.

35.     Crystal Gardens paid nothing after the initial payment. *Id.* at 100:4–6; Friedman Decl. ¶ 28.

36.     On December 30, 2020, an engineer retained by CenturyLink performed a physical site survey of the Service Address and did not evaluate CenturyLink's fiber capacity in the Estes Park area. Friedman Decl. ¶ 26.

37.     A site survey evaluates how to physically connect the service address to CenturyLink's network and does not evaluate overall network capacity in the service area. Brooks Decl. ¶¶ 16-17.

38.     In January 2021, CenturyLink provided a "Customer Commit Date" under the Order of April 16, 2021, which was the date by which CenturyLink intended to provide the service. Brooks Decl. ¶ 18.

39.     In April 2021, CenturyLink determined that additional construction would be required to provision the services requested by Crystal Gardens in the Order. Brooks Decl. ¶ 19 & Ex. A at CTL_000067–000068; *see also* Friedman Decl. ¶ 29, Ex. G, Ex. H.

40.     Specifically, CenturyLink determined that the Estes Park service area was at capacity and could not support the bandwidth requested by Crystal Gardens. Brooks Decl. ¶ 20 & Ex. A at CTL_000067–000068.

41.     Thus, in order to fulfil the Order, CenturyLink would need to expand the fiberoptic "pipe" serving the entire Estes Park service area. Brooks Decl. ¶ 21 & Ex. B at CTL_000232.

42.     This type of construction is known as a "backbone job." Brooks Decl. ¶ 22, Ex. A at 000067–000068, Ex. B at CTL_000232.

43.     The backbone job would require boring through of 19,500 feet of earth and laying 19,500 feet of new fiberoptic cable. Brooks Decl. ¶¶ 23-24, Ex. B at CTL_000232.

44.     The backbone job would also require permits from the relevant federal, state, and local agencies to perform this work. Brooks Decl. ¶ 25 & Ex. B at CTL_000232.

45.     The construction required to provision the services requested in Order would cost approximately $1,043,700. Brooks Decl. ¶ 26 & Ex. B at CTL_000232; *see also* Quereau Decl., Ex. A, Crystal Gardens Dep. at 109:24–111:8 (testifying that Plaintiff has no basis to dispute the necessity of additional construction or the costs associated with construction), Ex. E, Mincher Dep. at 85:16–85:18 (conceding that "the proposal they [CenturyLink] provided with a million-dollar cost is probably accurate" for fiberoptic service).[1]

46.     On May 14, 2021, CenturyLink informed Mr. Ferguson of the necessary additional construction and associated expenses. Quereau Decl., Ex. A, Crystal Gardens Dep. at 111:9–21 (confirming someone from CenturyLink notified him of the necessary

---

[1] Mr. Mincher is the purported telecommunications expert witness retained and offered by Crystal Gardens.

additional construction expenses), Ex. D, Pl.'s Suppl. Resps. to 1st Set of Reqs. for Admis. at 3 (RFA 6); Friedman Decl. ¶ 31 & Ex. G at CTL_000064.

47. Mr. Ferguson did not approve of the construction charges and refused to pay them. Quereau Decl., Ex. A, Crystal Gardens Dep. at 115:9–13 (stating Crystal Gardens refused to pay the construction amounts), Ex. F, Pl.'s Resps. to 1st Set of Reqs. for Admis. at 4 (RFAs 7 & 8); Friedman Decl. ¶ 33.

48. In response to Crystal Gardens' refusal to pay the additional construction charges, CenturyLink informed Crystal Gardens that the contract was cancelled. Quereau Decl., Ex. F, Pl.'s Resps. to 1st Set of Reqs. for Admis. at 4 (RFA 9).

49. In December 2021, CenturyLink asked Crystal Gardens to provide payment information so that CenturyLink could return Crystal Gardens' initial payment of $29,890. Friedman Decl. ¶ 35 & Ex. I; Quereau Decl., Ex. D, Pl.'s Suppl. Resps. to 1st Set of Reqs. for Admis. at 3 (RFA 10).

50. Crystal Gardens refused to provide this payment information. Friedman Decl. ¶ 37 & Ex. I at CTL_000238; Quereau Decl., Ex. F, Pl.'s Resps. to 1st Set of Reqs. for Admis. at 4 (RFA 11).

51. In March 2022, CenturyLink mailed a refund check of all amounts paid by Crystal Gardens, plus interest, to litigation counsel for Crystal Gardens. Friedman Decl. ¶ 38; *see also* ECF. No. 17, Scheduling Order, § 4 "Undisputed Facts" ("CenturyLink sent a check, payable to Crystal Gardens, in the amount of $29,902.94 to Plaintiff's counsel of record."); Quereau Decl., Ex. F, Pl.'s Resps. to 1st Set of Reqs. for Admis. at 4 (RFA 11).[2]

---

[2] CenturyLink's refund check included the $29,890 initial payment plus $12.94 in interest.

52.     Crystal Gardens did not deposit or cash the refund check. Quereau Decl., Ex. A, Crystal Gardens Dep. at 117:1–19 (refusing to cash the check because it "expected CenturyLink to fulfill their end of the bargain").

53.     Since September 2021 and continuing through present day, Crystal Gardens has received high speed internet at its property from Trailblazer Broadband. Quereau Decl., Ex. B, Pl.'s Resps. to 1st Set of Interrogs. at 4 (Interrog. 8). This service provides download speeds of up to 1 gigabit per second, *id.*, which is double the download speeds in the Order (500 megabits per second). *See* Friedman Decl., Ex B, Order & Attachs. at PLAINTIFF 000002.

54.     Crystal Gardens has experienced "no gaps in service" with Trailblazer Broadband. Quereau Decl., Ex. B, Pl.'s Resps. to 1st Set of Interrogs. at 4 (Interrog. 8).

55.     Crystal Gardens paid $319.90 for installation of Trailblazer Broadband and pays $159.95 per month for the service. *Id.*

56.     Crystal Gardens has not lost any revenues as a result of not receiving the services from CenturyLink requested in the Order. Quereau Decl., Ex. A, Crystal Gardens Dep. at 123:19–21 ("Q: Have you lost out on any sales because of your inability to get Internet from CenturyLink? A: Sales, no.").

## ARGUMENT

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case." *Nobody in Particular*

*Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1067 (D. Colo. 2004). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest only on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Nobody in Particular Presents, Inc.*, 311 F. Supp. 2d at 1067. "A genuine issue of fact does not exist, and summary judgment is appropriate, if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.* "If the nonmoving party's evidence is merely colorable, or is not significantly probative," summary judgment should be granted. *Id.* at 1068.

## I. Crystal Gardens' Breach of Contract Claim Fails.

Under the governing Local Access Service Exhibit, Crystal Gardens' Order was cancelled when it refused to pay additional construction charges necessary to complete the Order. There is no dispute of material fact, and Crystal Gardens' claim fails as a matter of law.

### A. The Local Access Service Exhibit Governs this Dispute.

The undisputed facts show that the Local Access Service Exhibit was incorporated by reference into the Order and governs this dispute. The Order and contractual relationship between Crystal Gardens is governed by New York law, as stated in the MSA. *See* Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00008 (MSA § 15.7) ("This Agreement will be governed and construed in accordance with the laws of the State of

New York, without regard to its choice of law rules."). Under New York contract law, "[p]arties to a contract are plainly free to incorporate by reference, and bind themselves inter sese to, terms that may be found in other agreements." *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002)); *New London Assoc., LLC v. Kinetic Social LLC*, 384 F. Supp. 3d 392, 404 n.7 (S.D.N.Y. 2019) (quoting *Aceros* and finding that a sales order incorporated a master services agreement by reference). Courts look to whether the additional terms were "expressly identified" and "clearly communicated" to be incorporated by reference. *See Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018).

Here, in addition to being subject to the MSA, the Order is subject to the Local Access Service Exhibit because the products in the Order include Local Access service. The Order "expressly identified" and "clearly communicated" that both the MSA and the Local Access Service Exhibit are incorporated by reference:

Terms and Conditions ….

***Lumen provides CenturyLink IQ Data Bundle services under***: ... the CenturyLink IQ Networking, ***Local Access*** and Rental CPE ***Service Exhibits***. CenturyLink IQ Data Bundle is a bundle composed of the following services: (a) CenturyLink IQ Networking (b) Local Access and (c) Rental CPE....

…

***The services identified in this Order is subject to the Lumen or CenturyLink Master Service Agreement(s) and applicable Service Exhibit(s***)/Service Schedule(s) between CenturyLink Communications, LLC d/b/a Lumen Technologies Group and Customer…

Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 00002 (emphasis added); *id.* § 4, at PLAINTIFF 00003. There is no other possible reading of the Order. Indeed,

Mr. Ferguson testified on behalf of Crystal Gardens not only that the Local Access Service Exhibit is expressly referenced in the Order, but that he received a copy of it before signing the Order. Quereau Decl., Ex. A, Crystal Gardens Dep. at 88:13-22.[3]

### B. Crystal Gardens' Order Was Cancelled When It Refused To Pay Additional Necessary Construction Expenses.

The Local Access Service Exhibit explained in clear and unambiguous terms that additional construction expenses might be possible—and that the Order would be cancelled if Crystal Gardens declined to pay them. Under New York law, "'[a] contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. Consequently, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Hylan Ross, LLC v. 2582 Hylan Boulevard Fitness Grp., LLC*, 172 N.Y.S.3d 29, 31–33 (N.Y. App. Div. 2022) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009)). "[A] contractual provision is ambiguous only 'when it is reasonably susceptible to more than one reading.'" *Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012).[4]

---

[3] The outcome is the same under Colorado law. *See French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022) ("And, as pertinent here, it has long been settled that contracting parties may incorporate contract terms by reference to another document. In Colorado, for an incorporation by reference to be effective, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" (internal citations omitted)).

[4] Again, Colorado law applies the same principles, and its application would lead to the same result. *See Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000) ("The primary goal of contract interpretation is to determine and give effect to the intent of the parties. The intent of the parties to a contract is to be

There is no ambiguity in the Local Access Service Exhibit about additional construction expenses. If the Customer (Crystal Gardens) does not approve any construction charges required for service after CenturyLink notifies the customer of such charges, then the Order is deemed cancelled:

> 4.1 <u>Ancillary Charges</u>. Ancillary charges applicable to Service include but are not limited to those ancillary services set forth in this section. If an ancillary charge applies in connection with provisioning a particular Service, CenturyLink will notify Customer of the ancillary charge to be billed to Customer. ***Customer may either approve or disapprove CenturyLink providing the ancillary service***.
>
> ...
>
> > (b) <u>Construction Charges</u>. ***Construction charges apply if***; (i) special construction is required to extend Service to the demarcation point; or (ii) other ***activities*** not covered under the Building Extension Service Service Schedule ***are required beyond the demarcation point, that cause CenturyLink to incur additional expenses for provisioning the Service*** ('Construction'). ***If Customer does not approve of the Construction charges after CenturyLink notifies Customer of the charges, the Service ordered will be deemed cancelled***.

Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 0000013 (§ 4.1) (emphasis added). Relatedly, the Local Access Service Exhibit also states that "[p]rovision of Services ***is subject to availability of adequate capacity*** and CenturyLink's acceptance of an Order." *Id.* § 3 (emphasis added).

It is undisputed that Crystal Gardens knew about and agreed to this condition. On December 9, 2020—the day before signing the Order—Mr. Ferguson was told by Mr. Friedman, in writing, that additional construction charges might apply and, in the event

---

determined primarily from the language of the instrument itself." (internal citations omitted)).

they did, Crystal Gardens would have the option to cancel the service or move forward by paying the additional charges:

> Q: Is there going to be a high cost that will increase the monthly spend once your site survey engineer arrives and confirms a need for a higher spend?
>
> A: Very unlikely but possible. If so, you can cancel the service request at $0 cost or move forward with the difference between what is quoted and what the high cost would be."

Friedman Decl. ¶ 11 & Ex. A, PLAINTIFF 00054. And Crystal Gardens has now admitted in discovery that "Plaintiff was aware that in the event additional construction charges would be required, Plaintiff could cancel or pay the difference between what was quoted and what the high cost would be." Quereau Decl., Ex. D, Pl.'s Suppl. Resps. to 1st Set of Reqs. for Admis. at 3 (RFA 5). Crystal Gardens further admitted that it received and viewed the Local Access Service Exhibit before signing the Order, *see* Quereau Decl., Ex. A, Crystal Gardens Dep. at 85:20–88:25.

It is also undisputed that CenturyLink determined additional construction costs would be required to provision the service requested in the Order; that CenturyLink informed Mr. Ferguson of those costs; and that Mr. Ferguson, on behalf of Crystal Gardens, refused to pay them.

- In April 2021, CenturyLink determined that additional construction would be required to fulfil Crystal Gardens' Order because the Estes Park service area was at capacity. Brooks Decl. ¶¶ 19–26, Ex. A, Ex. B.

- To provide the requested service, CenturyLink determined it would need to expand the fiberoptic "pipe" serving the entire Estes Park service area, which would require boring through 19,500 feet of earth, laying 19,500 feet of new fiberoptic cable, and obtaining permits from the relevant federal, state, and local agencies, at an estimated cost of approximately $1,043,700. *Id.* ¶¶ 21–26. Crystal

Gardens admitted it has no basis to dispute the need for this construction or the costs involved. Quereau Decl., Ex. A, Crystal Gardens Dep. at 109:24–111:8. Indeed, Crystal Gardens' own purported expert has testified that the estimated construction costs for fiberoptic cable are accurate. Quereau Decl., Ex. E, Mincher Dep. at 85:16–85:18.

- On May 14, 2021, CenturyLink informed Crystal Gardens of the necessary additional construction charges. Friedman Decl. ¶ 32 & Ex. G at CTL_000064; Quereau Decl., Ex. D, Pl.'s Suppl. Resps. to 1st Set of Reqs. for Admis. at 3 (RFA 6), Ex. A, Crystal Gardens Dep. at 111:9–21.

- Mr. Ferguson did not approve of the construction charges and refused to pay them. Friedman Decl. ¶ 33; Quereau Decl., Ex. F, Pl.'s Resps. to 1st Set of Reqs. for Admis. at 4 (RFAs 7 & 8), Ex. A, Crystal Gardens Dep. at 115:9–13.

As a result, under the plain terms of Section 4.1(b) of the Local Access Service Exhibit, the Order was cancelled.

### C. Crystal Gardens' Attempts to Dispute the Cancellation Fail.

Crystal Gardens has offered several shifting grounds to dispute the cancellation—because the non-recurring charges in the Order supposedly represented a cap on construction charges, because CenturyLink had completed a site survey, and because CenturyLink provided a "Customer Commit Date" under the Order before determining that additional construction was necessary. All fail.

*First*, the Order does not specify or limit the potential cost of construction to provide the services requested by Crystal Gardens. The Order does not contain the word "construction." The non-recurring charges in the Order are also not construction charges—indeed, the fact that CenturyLink gave Crystal Gardens two term options with *different* non-recurring charges shows that the non-recurring charges are simply part of

the price for service. *See* Friedman Decl. ¶ 10 & Ex. B at PLAINTIFF 00002. But even if the non-recurring charges reflected some estimate of construction charges, the relevant language in the Local Access Service Exhibit refers to "**additional** expenses for provisioning the Service." Friedman Decl., Ex. B, Order & Attachs. at PLAINTIFF 0000013 (§ 4.1) (emphasis added).

*Second*, CenturyLink's completion of a site survey in December 2020 did not prevent a subsequent cancellation due to Crystal Gardens' decision not to pay the construction charges. A site survey is CenturyLink's preliminary evaluation of a service address and not does determine nearby network capacity. Brooks Decl. ¶¶ 16–17. Nothing in the operative contract ties the cancellation condition to the site survey: the relevant documents do not even mention a site survey, nor was CenturyLink's network capacity in Estes Park discussed during the site survey. Quereau Decl., Ex. A, Crystal Gardens Dep. at 98:22-25 ("Q. … did Mr. Cannon [site survey engineer] ever mention anything to you about evaluating CenturyLink's overall regional network capacity at his site survey? A. Not that I recall.").

*Third*, and similarly, whether (and when) CenturyLink provides a "Customer Commit Date" does not preclude this type of cancellation. The Customer Commit Date is the date by which CenturyLink intends to provide the service requested in an order. Brooks Decl. ¶ 18. Providing a Customer Commit Date is one way CenturyLink accepts an order, as explained in both the Order and the Local Access Service Exhibit. Friedman Decl., Ex. B, Order § 3, PLAINTIFF 00005 ("Lumen will notify Customer of acceptance of requested Service in this Order [1] by delivering ... the date by with Lumen will install

Service ('Customer Commit Date'), [2] by delivering the Service, or [3] by the manner described in the Service Exhibit/Service Schedule."); *id.* at PLAINTIFF_0000013 (Local Access Service Exhibit § 3) ("CenturyLink will notify Customer of acceptance of an Order for Service by delivering (in writing or electronically) the date by which CenturyLink will install Service (the 'Customer Commit Date'), or by delivering the Service.").

But these acceptance provisions have no impact on the cancellation provision in the Local Access Service Exhibit, for at least two reasons. As an initial matter, the very next sentence in the Local Access Service Exhibit after the definition of the Customer Commit Date explains: "Provision of Services is subject to **availability of adequate capacity** and CenturyLink's acceptance of an Order." *Id.* at PLAINTIFF_0000013 (Local Access Service Exhibit § 3) (emphasis added). Acceptance of the Order is thus distinct from availability of adequate capacity. It is undisputed that CenturyLink lacked adequate capacity to fulfill Crystal Gardens' Order without costly construction. *See* Brooks Decl. ¶¶ 19-26; Quereau Decl., Ex. A, Crystal Gardens Dep. at 108:22-111:8.

Moreover, and as with Crystal Gardens' site survey argument, the Local Access Service Exhibit does not limit this cancellation provision to the period before CenturyLink provides a Customer Commit Date. The Local Access Service Exhibit uses the term "Customer Commit Date" in several places—including in Section 4.1(a)—but not in Section 4.1(b). The absence of a reference to the "Customer Commit Date" in Section 4.1(b) means that this cancellation provision continues to apply after the Customer Commit Date. *See, e.g.*, *In re September 11 Litig.*, 640 F. Supp. 2d 323, 334 (S.D.N.Y. 2009) ("The parties knew how to use the term negligence, for they did so elsewhere in

the lease, as in Section 40(b). Read as a whole, the lease gives no indication that the parties intended to make Section 16 a negligence provision, but somehow neglected to use the word 'negligence' or any equivalent word of culpability."); *Weight Loss Healthcare Centers of Am., Inc. v. Off. of Pers. Mgmt.*, 655 F.3d 1202, 1210 (10th Cir. 2011) ("When the drafters so clearly knew how to express one meaning, their failure to do so implies that the meaning was not intended.").

In short, the parties' contract contemplated that additional construction charges might arise after CenturyLink accepted the Order, and addressed this contingency by giving Crystal Gardens the option to pay the additional construction charges or have the Order be cancelled—which happened here. Friedman Decl., Ex. B, Order and Attachs. at PLAINTIFF 0000013 (Local Access Service Exhibit § 4.1(b)). Because the Order was cancelled, Crystal Gardens cannot prove its claim for breach of contract. The Court should grant summary judgment in CenturyLink's favor.

## II. Crystal Gardens Has Already Received All Relief to Which It Could Be Entitled.

The Court should also grant summary judgment in CenturyLink's favor because Crystal Gardens has already received all relief to which it could be entitled: a full refund of all payments made. As explained below, Crystal Gardens is not entitled to either specific performance or damages—and certainly cannot obtain both, because they are mutually exclusive remedies. *See Pecorella v. Greater Buffalo Press, Inc.*, 486 N.Y.S.2d 562 (N.Y. App. Div. 1985) ("Specific performance is a discretionary remedy which is an alternative to the award of damages as a means of enforcing a contract." (quoting *Hadcock Motors v. Metzger*, 459 N.Y.S.2d 634, 636 (1983)).

## A.    Specific Performance Is Not an Appropriate Remedy Here.

Specific performance is an "extraordinary remedy" which requires Crystal Gardens to show that the "remedies at law are incomplete and inadequate to accomplish substantial justice." *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 502 (S.D.N.Y. 2011). When evaluating this remedy, "the court ... must consider the burden that specific performance would impose on defendant[] and weigh the benefit to plaintiff against the harm to defendant[]." *Cohen v. CASSM Realty Corp.*, 39 N.Y.S.3d 597, 619 (N.Y. Sup. Ct. 2016). Specific performance is thus not an appropriate remedy where, like here, compelling performance of the contract would impose a "disproportionate or inequitable burden" upon the counterparty. *See Cho v. 401–403 57th St. Realty Corp.*, 752 N.Y.S.2d 55, 57 (N.Y. App. Div. 2002).

The undisputed factual record here shows that specific performance would require CenturyLink to incur over $1 million dollars in construction costs to provide services to one customer, in exchange for a total of $66,000 over 24 months. *See* Friedman Decl. ¶¶ 17–18, Ex. B, Order & Attachs. at PLAINTIFF 00002; Brooks Decl. ¶¶ 19-26. In other words, granting this type of extraordinary remedy would impose a burden 15 times greater on CenturyLink than on Crystal Gardens. This "disproportionate" and "inequitable burden" alone shows that specific performance is inappropriate. *See Cho,* 752 N.Y.S.2d. at 57.

Moreover, Crystal Gardens has not met its burden to justify imposing such a burden on CenturyLink. Because of permitting delays and other reasons completely unrelated to internet service from CenturyLink, Crystal Gardens is not open to the public as intended, and it has no definite opening date. Quereau Decl., Ex. A, Crystal Gardens

Dep. at 25:5–15, 124:3–12. Crystal Gardens' internet usage is also quite limited. Crystal Gardens does very little uploading via the internet and its online activities do not include any online transactions, streaming, or social media presence. *Id.* at 54:8–56:12. As Mr. Ferguson testified, one of Crystal Gardens' website (crystalgardens.com) is "more or less, a landing page" and will remain so until the gardens open. *Id.* at 33:4–5. The other (thepathtohealing.com) gets extremely limited traffic—just 5 to 10 authentic (non-bot) visits per day. *See id.* at 51:10–18, 52:17-20. Nor are Crystal Gardens employees working online in a manner demanding CenturyLink's internet services, as Mr. Ferguson is the only employee, and he spends only a few hours per week working on all of Crystal Gardens' activities. Quereau Decl., Ex. C, Pl.'s 2nd Suppl. Resps. to 1st Set of Interrogs. at 2 (Interrog. 6); Quereau Decl., Ex. A, Crystal Gardens Dep. at 32:16–23.

Furthermore, there is no need to grant specific performance because it is undisputed that Crystal Gardens already has high-speed internet service through Trailblazer Broadband—which it obtained months before suing CenturyLink. Quereau Decl., Ex. B, Pl.'s Resps. to 1st Set of Interrogs. at 4 (Interrog. 8). In fact, Trailblazer Broadband provides *faster* internet download speeds than the services contemplated in the Order, and it is less expensive. *Id.* Of note, Crystal Gardens has experienced "no gaps in service" with Trailblazer Broadband. *Id.* Even Crystal Garden's purported expert testified that the service Crystal Gardens already has through Trailblazer Broadband is at least competitive to what CenturyLink was going to provide. Quereau Decl., Ex. E, Mincher Dep. at 88:8-23. These undisputed facts do not justify the "extraordinary remedy" of specific performance.

**B.     The Contract Bars Further Monetary Relief.**

The Order and incorporated contractual terms also bar the damages and attorneys' fees Crystal Gardens seeks. Under New York law, "[a] limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 436 (1994). Thus, "if contracting parties agree to a limitation-of-liability provision, it will be enforced unless unconscionable, even if it leaves a non-breaching party without a remedy." *Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F. Supp. 3d 259, 264 (E.D.N.Y. 2014).

Here, as alternative relief, Crystal Gardens seeks "$1,570.00 monthly recurring for continued highspeed services, from April 15, 2021 to date, plus deposit Plaintiff paid of $28,320.00," as well as attorneys' fees. Quereau Decl., Ex. C, Pl.'s 2nd Suppl. Resps. to 1st Set of Interrogs. at 2 (Interrog. 4). Crystal Gardens is not entitled to any of this relief.

*First*, there is no basis to require the return of Crystal Gardens' initial payment of $29,890 to CenturyLink, because CenturyLink already provided a full refund of that amount, plus interest, to Crystal Gardens through its counsel. Friedman Decl. ¶¶ 35-38; *see also* ECF. No. 17, Scheduling Order, § 4 "Undisputed Facts" ("CenturyLink sent a check, payable to Crystal Gardens, in the amount of $29,902.94 to Plaintiff's counsel of record."); Quereau Decl., Ex. A, Crystal Gardens Dep. at 116:19–117:19 (conceding that CenturyLink provided a refund that Crystal Gardens has refused to cash).

*Second*, other than the refund, the claim for damages is expressly barred by the contract. The Order makes clear that "neither party" will be liable for, among other things,

"lost revenues," "loss of goodwill," "loss of anticipated savings" or the "cost of repurchasing replacement service":

> Neither Party will be liable for damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Order.

Friedman Decl., Ex. B, Order and Attachs. at PLAINTIFF 00003 (Order § 5). The MSA includes a similar limitation:

> Damages Limitations. Neither party will be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement services, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Agreement or any Order.

*Id.* at PLAINTIFF 00006 (MSA § 9.1).

Crystal Gardens' demand for "$1,570 monthly" for "continued highspeed services" (the same amount as the monthly recurring charges listed in the Order) clearly amounts to its estimate of the approximate "cost of purchasing replacement services"—and thus is barred. *Id.* at PLAINTIFF 00003 (Order § 5), PLAINTIFF 00006 (MSA § 9.1). And because these clauses do not unreasonably favor either party—rather, they limit the liability of both Crystal Gardens and CenturyLink—they are enforceable. *See Process Am., Inc.,* 35 F. Supp. 3d at 264.

*Third*, Crystal Gardens has suffered no monetary harm. It is undisputed that Crystal Gardens has not lost any revenues as a result of not receiving the services from CenturyLink requested in the Order. Quereau Decl., Ex. A, Crystal Gardens Dep. at 123:19–21 ("Q: Have you lost out on any sales because of your inability to get Internet

from CenturyLink? A: Sales, no."). It is also undisputed that Crystal Gardens has received a check for a full refund plus interest. ECF. No. 17, Scheduling Order, § 4 "Undisputed Facts" ("CenturyLink sent a check, payable to Crystal Gardens, in the amount of $29,902.94 to Plaintiff's counsel of record."). And it is undisputed that Crystal Gardens currently has minimal need for internet, and has received internet services—with a higher download speed, at a lower cost, and without interruption—since before this lawsuit began. Quereau Decl., Ex. A, Crystal Gardens Dep. at 32:16–23 (Mr. Ferguson works 4-5 hours per week on Crystal Gardens), 54:8–56:12 (Crystal Gardens does no online transactions, streaming, or social media presence), 51:10–18, 52:17-20 (thepathtohealing.com only receives 5-10 visitors per day); 33:4-5 (crystalgardens.com is just a "landing page"), 25:5–15 (gardens are not open); Ex. B, Pl.'s Resps. to 1st Set of Interrogs. at 4 (Interrog. 8) (TrailBlazer Broadband).

Crystal Gardens is also not entitled to any attorneys' fees. "[E]ntitlement to attorney's fees in a diversity action is governed by the same state law that governs the substantive issues." *Oklahoma Fixture Co. v. ASK Comput. Sys.*, 45 F.3d 380, 380 (10th Cir. 1995). Under New York law, "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule." *Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (N.Y. 1989). Here, nothing in the Order, the MSA, or the Local Access Service Exhibit authorizes Crystal Gardens to recover attorneys' fees—which is far from the "unmistakably clear" language required to shift fees under a contract governed by

New York law. *Id.* at 492. There is also no statute or court rule that supports fee shifting in favor of Crystal Gardens.

## **CONCLUSION**

For all of the above reasons, CenturyLink respectfully requests that the Court enter summary judgment against Crystal Gardens.

Dated: June 16, 2023

Respectfully submitted,

By: */s/ Alec P. Harris*
Alec P. Harris, #47547
Kathleen F. Guilfoyle, #55284
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@atllp.com
kguilfoyle@atllp.com
aharris@atllp.com

Charles W. Steese
PAPETTI SAMUELS WEISS
MCKIRGAN LLP
16430 N. Scottsdale Road, Ste. 290
Scottsdale, AZ 85254
480.800.3537
csteese@pswmlaw.com

*Attorneys for Defendant CenturyLink
Communications, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed and served via ECF filing on June 16, 2023 to:

Erik G. Fischer
Megan A. McDonald
Erik G. Fischer, P.C.
125 South Howes Street, Suite 900
Fort Collins, CO 80521
erik@fischerlawgroup.com
megan@fischerlawgroup.com

*Attorneys for Plaintiff*

*/s/  Marina Brainerd*
Marina Brainerd