IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 22-cv-0536-WJM-SP

CRYSTAL GARDENS SANCTUARY, INC.,

    Plaintiff,

v.

CENTURYLINK COMMUNICATIONS, LLC,
doing business as Lumen Technologies Group,

    Defendant.

**ORDER GRANTING CENTURYLINK COMMUNICATIONS, LLC'S
MOTION FOR SUMMARY JUDGMENT**

    This matter arises out of Plaintiff Crystal Gardens Sanctuary, Inc.'s ("Plaintiff") contract with Defendant CenturyLink Communications, Inc. ("Defendant") to provide fiberoptic internet services. (ECF No. 47 at 8–9, ¶¶ 12–13; ECF No. 48 at 2, ¶¶ 1–2.) Before the Court is Defendant's Motion for Summary Judgment ("Motion"). (ECF No. 47.) Plaintiff filed a response in opposition. (ECF No. 48.) Plaintiff filed a reply. (ECF No. 51.) For the following reasons, the Motion is granted.

**I. STANDARD OF REVIEW**

    Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

### A.   The Contracted-for Fiberoptic Internet Services

On December 10, 2020, the parties entered into an agreement ("Service Agreement") for Defendant, doing business as Lumen Technologies Group, to provide fiberoptic internet services to an address located at 4905 United States Highway 36, Estes Park, Colorado ("Property").  (ECF No. 47-3.)  In exchange for these services, Plaintiff agreed to pay a non-recurring fee of $28,320 and a monthly recurring fee of $1,570 for 24 months, for a total of $66,000.  (*Id.* at 3.)  On December 17, 2020, Plaintiff made an initial payment via wire of $29,890, representing the non-recurring fee and first monthly fee.  (*See* ECF No. 47 at 13, ¶ 24; ECF No. 48 at 6.)

In April 2021, Defendant determined that the Estes Park service area in which the Property is located was at capacity, and therefore could not support the contracted-

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

for fiberoptic internet services.  (ECF No. 47 at 13–14, ¶¶ 40–42; *see* ECF No. 47-1 at ¶ 30.)  Defendant informed Plaintiff that expanding the Estes Park service area's capacity to accommodate the requested services would require substantial construction at the cost of more than $1 million ("Construction Costs").  (ECF No. 47 at 14–15, ¶¶ 43–46.)  When Plaintiff did not approve and agree to pay the Construction Costs, Defendant considered the Service Agreement cancelled and attempted to return the money it had received from Plaintiff.  (*Id.* at 15, ¶¶ 48–51.)  Plaintiff has not accepted the attempted refund.  (ECF No. 48 at 9.)

**B.   Relevant Provisions**

   1.   Service Agreement

The Service Agreement provides the following terms and conditions, in relevant part:

> Lumen provides CenturyLink IQ Data Bundle services under . . . the CenturyLink IQ Networking, Local Access and Rental CPE Service Exhibits.
>
> . . .
>
> **Terms and Conditions Governing This Order**
>
> . . .
>
> 4.   The Service identified in this Order is subject to the Lumen or CenturyLink Master Service Agreement(s) and applicable Service Exhibits/Service Schedule(s) between CenturyLink Communications, LLC d/b/a Lumen Technologies Group and Customer . . . .

 (ECF No. 47-3 at 3–4.)

   2.   Master Service Agreement

The Lumen Master Service Agreement further provides, in relevant part:

> **15.7   Governing Law; Amendment.**  This Agreement will be governed and construed in accordance with the laws of

3

> the State of New York, without regard to its choice of law rules.

(*Id.* at 9.)

### 3. Local Access Service Exhibit

The Local Access Service Exhibit ("Local Access Exhibit") further provides, in relevant part:

> **3. Ordering.** . . . Provision of Services is subject to availability of adequate capacity and CenturyLink's acceptance of an Order.
>
> . . .
>
> **4.1 Ancillary Charges.** Ancillary charges applicable to Service include but are not limited to those ancillary services set forth in this section. If an ancillary charge applies in connection with provisioning a particular Service, CenturyLink will notify Customer of the ancillary charge to be billed to Customer. Customer may either approve or disapprove CenturyLink providing the ancillary service.
>
> . . .
>
> **(b) Construction.** Construction charges apply if; [*sic*] (i) special construction is required to extend Service to the demarcation point; or (ii) other activities not covered under the Building Extension Service Schedule are required beyond the demarcation point, that cause CenturyLink to incur additional expenses for provisioning the Service ("Construction"). If Customer does not approve of the Construction charges after CenturyLink notified Customer of the charges, the Service ordered will be deemed cancelled.

(*Id.* at 14.)

## III. LAW

The parties agree that all relevant agreements are governed by New York Law. (*See* ECF No. 47 at 17–18; ECF No. 48 at 5–6.) Under New York law, the interpretation of a written contract is generally "the responsibility of the court." *Hartford Acc. & Indem.*

4

*Co. v. Wesolowski*, 33 N.Y.2d 169, 172 (N.Y. 1973). "The objective in any question of the interpretation of a written contract, of course, is to determine 'what is the intention of the parties as derived from the language employed.'" *Id.* (citation omitted); *accord Malmsteen v. Univ. Music Grp., Inc.*, 940 F. Supp. 123, 130 (S.D.N.Y. 2013) (applying New York law). "Typically, the best evidence of intent is the contract itself." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (applying New York law). Further, "[t]o give effect to the intent of the parties, a court must interpret a contract by considering all of its provisions, and 'words and phrases . . . should be given their plain meaning.'" *Malmsteen*, 940 F. Supp. at 130 (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."[2] *Id.* (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (applying New York law)). "The question of whether the language of a contract is ambiguous is a question of law to be decided by the Court." *Compagnie Financiere*, 232 F.3d at 157; *see also Malmsteen*, 940 F. Supp. 2d at 130. "Unambiguous language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself and concerning which there is no reasonable basis for a difference in opinion.'" *Compagnie Financiere*, 232 F.3d at 159 (quoting *Seiden Assoc. Inc. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

---

[2] As noted in *Malmsteen*, there are circumstances where a contract's language is ambiguous and summary judgment is still appropriate. 940 F. Supp. 2d at 131. Those circumstances, however, are not relevant to the Court's ruling on the Motion.

## IV. ANALYSIS

Defendant argues it is entitled to summary judgment in its favor for two reasons: (1) the Service Agreement was cancelled by Plaintiff when it refused to pay the Construction Costs; and (2) any damages to which Plaintiff may be entitled have already been tendered in the form of a check in the amount of $29,890. (ECF No. 47 at 17–31.) Plaintiff argues that Defendant's attempt to cancel the Service Agreement based on that Plaintiff's refusal to pay the Construction Costs was ineffective because Defendant had already breached the Service Agreement. (ECF No. 48 at 6.) Further, it argues summary judgment is inappropriate because there is a material dispute as to damages. (*Id.* at 7–11.)

### A. The Service and Local Access Exhibits Are Unambiguous

Under New York law, "[p]arties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements." *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) (quoting *Ronan Assocs. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994)) (alteration and emphasis in original). The Service Agreement specifically incorporates the Local Access Exhibit. (ECF No. 47-3 at 3–4.) In turn, the Local Access Exhibit expressly provides, in unambiguous terms, that: (1) the provision of services agreed to in the Service Agreement are "subject to availability of adequate capacity"; (2) Defendant will notify Plaintiff of any ancillary charge to be billed to Plaintiff, which can either be accepted or rejected, including construction costs; and (3) if Plaintiff refuses to pay properly noticed construction costs, the Service Agreement will be deemed cancelled. (*Id.* at 14.)

As the Court notes above, the Local Access Exhibit is indeed unambiguous.

6

Legal and general-use dictionaries agree that the Local Access Exhibit's limitation that "Provision of Services is subject to availability of adequate capacity," means that Defendant's obligation to provide fiberoptic internet services is contingent upon later confirmation that sufficient capacity for those services exists.  (*Id.* at 14; *see Subject*, Black's Law Dictionary (11th ed. 2019) (defining "subject" as "[d]ependent on or exposed to (some contingency)"); S*ubject,* Merriam-Webster Online (defining "subject" (adjective) as "contingent on or under the influence of some later action"), www.merriam-webster.com/dictionary/subject.)

The Local Access Exhibit then provides that Defendant will notify the Plaintiff, "[i]f an ancillary charge applies in connection with provisioning a particular Service."  (ECF No. 47-3 at 14.)  An "ancillary charge" is defined as "charges applicable to . . . those ancillary services set forth in" Section 4.1, including "special construction . . . required to extend Service to the demarcation point."  (*Id.*)  The construction services and related Construction Costs were clearly "special" because they were specifically required to fulfill Plaintiff's order in the Service Agreement.  *Special*, Merriam-Webster Online (defining "special" as "designed for a particular purpose or occasion"), www.merriam-webster.com/dictionary/special.  The construction services were intended to "extend" service in the sense that they would make fiberoptic internet available to Plaintiff when it previously was not.  *Extend*, Merriam-Webster Online (defining "extend" as "to cause to reach (as in distance or scope)").  And though not explicitly addressed by the Motion, it is clear from the Local Access Exhibit that the "demarcation point" referred to in Section 4.1(b) is Plaintiff's service address.  (*See* ECF No. 47-3 at 13 ("If a generic demarcation point (such as a street address) is provided, the demarcation point . . . will be [the] . . .

7

Minimum Point of Entry (MPOE) at such location . . . .  CenturyLink will maintain Service to the demarcation point only.").)

Once a Plaintiff was informed of the need for ancillary construction services and charges, the Local Access Exhibit provides two options: (1) it could agree to pay the Construction Charges, and Defendant would perform the construction and provide the contracted-for fiberoptic internet services; or (2) Plaintiff could refuse to pay, and the Service Agreement would be "deemed cancelled."  This language leaves no doubt that if Plaintiff refused to pay the Construction Costs, the Service Agreement would be treated as if it had been cancelled, even if neither party took any other action to do so.  *Deem*, Black's Law Dictionary (defining "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities it does not have" and "[t]o consider, think, or judge").

**B.   The Service Agreement Is Deemed Cancelled**

Under the foregoing construction, the Court observes that the Service Agreement and all other agreements incorporated therein are deemed cancelled.  The following facts are undisputed:

- Defendant informed Plaintiff (specifically Plaintiff's owner Steve Ferguson) that ancillary construction services, costing more than $1 million, would be required to deliver the contracted-for fiberoptic internet services (ECF No. 47-15 at 17 (Ferguson Dep. Tr. 111:9–15)); and

- Plaintiff did not approve or agree to pay the Construction Costs (*id.* at 18 (Ferguson Dep. Tr. 115:9–13)).

Nothing more is required to conclude the Service Agreement is deemed cancelled, and

8

Plaintiff's claim must fail.

## C. Plaintiff's Arguments Cannot Avoid this Result

Plaintiff attempts to avoid this obvious conclusion with two meritless arguments. (ECF No. 48 at 5–11.)

First, it argues that Defendant's breach preceded Plaintiff's refusal to pay the Construction Costs, and therefore remains actionable. (*Id.* at 5–7.) It asserts that when Defendant provided Plaintiff with a "Customer Commit Date" estimating the date it would deliver services, it accepted Plaintiff's order and any associated risk to delivering the contracted-for fiberoptic internet services. (*Id.*) Further, it characterizes Defendant as having "attempted to cancel the contract after it had already breached the contract." (*Id.* at 6.)

Plaintiff misunderstands both the terms of the Local Access Exhibit and Defendant's position. In fact, it was Plaintiff that took the final action necessary for the Service Agreement to be "deemed cancelled." *See supra*, Parts IV.A, B. Nor, apparently, does Plaintiff appreciate that Defendant's provision of a "Customer Commit Date" has no effect on whether the Service Agreement is properly deemed cancelled. The Local Access Exhibit is clear: "Provision of Services is subject to availability of adequate capacity *and* CenturyLink's acceptance of an Order." (ECF No. 47-3 at 14 (emphasis added).) The conjunctive "and" clearly indicates that the provision of services by Defendant is contingent upon both the availability of adequate capacity and Defendant's acceptance of Plaintiff's order. And just as Defendant acknowledges that it accepted Plaintiff's order; Plaintiff acknowledges that it has no reason to doubt that there was a lack of adequate capacity. (ECF No. 51 at 3 ¶ 10; ECF No. 47-15 at 16–17 (Ferguson Dep. Tr. 109:24–111:8).) Therefore, Defendant did not breach the Service

Agreement when it failed to deliver the contracted-for fiberoptic internet services by the Customer Commit Date because there was no capacity (and therefore no obligation) to deliver them.  The Service Agreement was always subject to the availability of adequate capacity, and when it became clear the available capacity was inadequate, Section 4.1(b) of the Local Access Exhibit provided a solution: (1) either Plaintiff could pay the Construction Costs; or (2) it could refuse to pay, and the Service Agreement would be deemed cancelled.

Second, Plaintiff argues summary judgment is inappropriate because there is a material dispute of fact as to damages.  This argument is unavailing because, as the Court has just explained, Defendant did not breach the Service Agreement.  Under New York law, "there can be no damages where there has been no breach."  *Chatham Plan v. Clinton Trust Co.*, 246 A.D. 498, 499 (N.Y. App. Div. 1936); *accord City of New York v. College Point Sports Ass'n, Inc.*, 61 A.D.3d 33, 48 (N.Y. App. Div. 2009) ("[A]bsent breach, there can be no damages." (citing *Pulka v. Edelman*, 40 NY.2d 781, 785 (N.Y. 1976))).  Therefore, there is no dispute of fact as to either damages or the appropriate remedy, (ECF No. 48 at 9–11); as a matter of law, Plaintiff has suffered no damages.[3]

Accordingly, Plaintiff's arguments in response to the Motion are rejected.

## V. CONCLUSION

For the reasons explained above, the Court ORDERS that:

---

[3] To state the obvious, the Court's Order has no bearing on Plaintiff's entitlement to a full refund of its initial payment to Defendant, which was made prior to the Service Agreement being deemed cancelled.  That is a separate issue that does not appear to be in dispute.  (*See* ECF No. 47 at 15 ¶ 51.)  Now that this dispute has been resolved, the Court expects that Defendant will issue a new check, for an appropriate amount, which the Plaintiff will accept.  (*See id.*; *id.* at 15 n.2 (noting Defendant's previously issued check included interest to that date).)

1. CenturyLink Communications, LLC's Motion for Summary Judgment (ECF No. 47) is GRANTED;

2. The Clerk shall enter judgment in favor of CenturyLink Communications, LLC and against Crystal Gardens Sanctuary, Inc.;

3. Crystal Gardens Sanctuary Inc.'s breach of contract claim is DISMISSED WITH PREJUDICE; and

4. CenturyLink Communications, LLC shall have its costs, if any, upon compliance with D.COLO.LCivR 54.1.

Dated this 21st day of May, 2024.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge